United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD DEAN HIGGINS,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　Defendant. | Case No.: 11-cv-3375 JSC<br><br>**ORDER 1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND 2) GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT (Dkt. Nos. 14, 15)** |

Plaintiff Richard Dean Higgins brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by Defendant Michael J. Astrue, the Commissioner of the Social Security Administration ("SSA"), which denied him disability benefits. Pending before the Court are Plaintiff's Motion for Summary Judgment (Dkt. No. 14) and Defendant's Cross-Motion for Summary Judgment (Dkt. No. 15). For the reasons set forth below, the Court DENIES Plaintiff's motion for summary judgment, and GRANTS Defendant's Cross-Motion for Summary Judgment.

//

//

# BACKGROUND

## A. Procedural History

Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act in March 2008. His applications were initially denied by the SSA, and Plaintiff appealed. On October 22, 2009, Plaintiff—represented by an attorney—appeared in Ukiah, California, before Administrative Law Judge Timothy C. Terrill ("the ALJ"). Plaintiff testified on his own behalf, alleging serious injuries to his back and both feet. On December 11, 2009, the ALJ issued an unfavorable written decision denying Plaintiff's applications and finding that he was not disabled within the meaning of the Act and regulations. Specifically, the ALJ found that while Plaintiff could not continue his past work in light of his injuries, Plaintiff's Residual Functional Capacity ("RFC") indicated that he could perform other existing work in the national economy. On May 4, 2011, the Decision Review Board informed Plaintiff that his case was not reviewed, thus exhausting his administrative remedies and deeming the ALJ's determination "the final decision of the Commissioner."

## B. Relevant Factual Background

Plaintiff Richard Dean Higgins was born on May 21, 1963. See Administrative Record ("AR") 97. He completed his education through the eighth grade and passed the General Educational Development Exam ("GED") at the end of the eleventh grade. AR 27. Plaintiff spent essentially all of his working life employed as a retail clerk or produce manager in the grocery business. AR 27, 117. He worked, at various points in his career, for Petrini's Markets, Safeway stores, and most recently for Andronico's Market in Danville, California. AR 117-128. Plaintiff presently resides in Riviera, California with his wife and child.

### 1. Work-Related Injuries

Plaintiff's first employment-related injury occurred in 1993, when he injured his back while working on a crew at a Safeway store. AR 314. Plaintiff was attempting to lift a large case of canned beans, weighing approximately fifty pounds, when he felt a sudden sharp pain

2

in his lower back. AR 314. He was treated for this injury shortly thereafter by a doctor in Manteca and, after a period of rest and conservative treatment, seemed to make a substantial (though not full) recovery. Id.

Plaintiff's second work-related injury occurred on September 30, 2005, while he was employed as a produce manager at Andronico's grocery store in Danville, California. AR 27-28. At the time of the injury, Plaintiff was working with another Andronico's employee to build a display for the Fall season. AR 205, 314. While bending and tossing heavy pumpkins to his coworker, Plaintiff felt a "snap" in his lower back, followed by a warm sensation and pain. AR 196, 390. From that point forward, Plaintiff was unable to return to his job at Andronico's and ceased to work entirely. See AR 117.

### 2. Alleged Current Medical Conditions

Plaintiff has been diagnosed with various back and foot-related problems stemming in large part from the two aforementioned injuries. The severity of the pain that these injuries cause Plaintiff—and his corresponding ability to participate in the workforce, even in a sedentary capacity—are major sources of contention between the parties in the instant case.

### 3. Available Medical Evaluations of Plaintiff's Impairments

#### i. Evaluation from John Muir Medical Center

Plaintiff visited the John Muir Medical Center on October 1, 2005—the day following his second work-related injury. AR 196. Plaintiff presented with pain "radiating down his right side" and slight numbness in his toes. Id. He further complained of some general foot and toe pain attributed to long hours on his feet at work. Id. Plaintiff's diagnosis was a "low back injury consistent with [a] sciatica type of injury." Id. The doctors further noted "acute low back pain with radiculopathy, cannot rule out underlying disk injury." Id. Plaintiff was prescribed various pain medications, including Toradol, Ibuprofen, Soma, and Vicodin. AR 201.

#### ii. Dr. Armstrong's Evaluation

Beginning on October 5, 2005, Plaintiff was placed under the care of Dr. Craig Armstrong at Roseburg Chiropractic. On that date, Plaintiff was examined and diagnosed

with a lumbar strain or sprain, lumbar radiculitis, and a lubosacral sprain or strain. AR 223. Dr. Armstrong noted that "[t]he patient does present to me with symptoms that suggest a disc is involved." Id.

On October 21, 2005, Plaintiff was again examined by Dr. Armstrong. At that time, Plaintiff claimed that he was "about 25% better with [chiropractic] treatment." AR 214. The doctor's report states that Plaintiff "still has moderate lower back pain on an intermittent rate" and that his "back tends to flare up with prolong [sic] sitting or standing longer than 25 minutes." Id. Dr. Armstrong further found that Plaintiff seemed to be getting "functionally better" in general. AR 215.

Plaintiff continued to see Dr. Armstrong for chiropractic care until December 2005, when he requested a referral to another primary treating physician. AR 212. Plaintiff stated that Dr. Armstrong's chiropractic treatments were helpful but "not long lasting and [he] believes medication is a better road for him to go down." Id. Accordingly, Plaintiff was referred to Dr. Jackie Chan. AR 212-213.

### iii. Dr. Chan's Evaluation

Dr. Jackie Chan, a Modesto physician, treated Plaintiff for several years for chronic pain management and care. Dr. Chan initially evaluated Plaintiff in October 2005. On September 13, 2006, Dr. Chan issued a Permanent and Stationary Report ("P&S Report") summarizing his views concerning Plaintiff's condition and concluding that he had reached maximum medical improvement as of that date. See AR 356. At that time, Dr. Chan's medical impression included some disc desiccation and bulging with mild neuroforaminal narrowing, persistent chronic low back pain, and occasional right lumbar radicular symptoms. Id. Dr. Chan stated that in his opinion, Plaintiff "has a 6% impairment of the whole person." AR 357. As to Plaintiff's capacity for vocational rehabilitation, Dr. Chan determined that "[Plaintiff] is likely a qualified injured worker. Permanent prophylactic work restrictions should include no lifting greater than 20 pounds, no pulling or pushing greater than 50 pounds, and no repetitive bending or stooping at the waist." AR 358.

4

On January 10, 2007, Dr. Chan affirmed the ultimate conclusions that he set forth in the original P&S Report in a letter to provide an updated assessment of Plaintiff as requested by various attorneys involved in this litigation. See AR 355. Specifically, Dr. Chan asserted that his "opinion really has not changed compared to my 9/13/2006 permanent and stationary report." Id.

### iv. Dr. Hiatt's Evaluation

Plaintiff was also under the care of Dr. Jason M. Hiatt, doctor of podiatric medicine ("DPM"), between November 2005 and October 2006. See AR 310. Plaintiff sought Dr. Hiatt's care in relation to pain that he was experiencing in both of his feet. AR 311. Dr. Hiatt determined that a MRI was needed to pinpoint the direct cause of Plaintiff's discomfort. AR 305.

In December 2005, Dr. Hiatt referred Plaintiff to Modesto Radiological Imaging to undergo the MRI. See id. On December 23, 2005, a MRI was conducted of Plaintiff's right foot. AR 290. The results suggested moderate osteoarthritis of the first metatarsophalangeal joint ("MTPJ"), known in layman's terms as the big toe joint. Id. Apart from that, the radiologist noted an essentially negative MRI of the right foot. Id.

Following the MRI, Plaintiff continued to report pain in his right foot. AR 301. Dr. Hiatt ultimately determined that Plaintiff was suffering from right tibial sesamoiditis and concluded that Plaintiff should have surgery to remove his right tibial sesamoid bone. AR 298, 301. Accordingly, Plaintiff underwent a right tibial sesamoidectomy at Stanislaus Surgical Hospital on February 24, 2006. AR 236-237, 298.

Plaintiff continued to see Dr. Hiatt in the weeks following his surgery. On April 6, 2006—five weeks after the surgery—Plaintiff returned to Dr. Hiatt's office for a progress check regarding the healing of the right tibial sesamoidectomy. AR 293. At that time, Plaintiff stated that the pain had "improved from [its] pre-operative level" but that he was still experiencing a "constant 4 out of 10 pain level." Id.

On April 28, 2006, Plaintiff was seen by Dr. Hiatt for further post-operative care. Id. Plaintiff returned to the office with "continued pain in the right foot, though diminished from

its pre-operative level." Id. Dr. Hiatt noted that Plaintiff's pain appeared to be "much decreased from previous exams" and that the right tibial sesamoidectomy was healing well. Id.

Plaintiff visited Dr. Hiatt's office again on July 27, 2006. Id. He complained of no new symptoms and reported that he had been able to do "some exercising." Id. On August 31, 2006, Plaintiff returned to the office complaining of "bilateral first MTPJ pain." Id. Plaintiff reported to the doctor that "the right sesamoid pain is gone," but that "he has had persistent pain in the left first MPTJ since [his] initial visit"—although "it now gets at most a 7 out of 10 pain level." Id. Dr. Hiatt noted "[m]oderate tenderness at the tibial sesamoid on the left foot" and ordered a MRI of Plaintiff's left foot, "considering the patient's sesamoid history on the right." Id.

Plaintiff had a MRI performed of his left foot on September 15, 2006. AR 288. On October 19, 2006, he returned to Dr. Hiatt's office to discuss the results. AR 291. According to Dr. Hiatt, the MRI indicated "moderate arthritic changes in the left first MTPJ." Id. In regards to the right foot, Dr. Hiatt found that Plaintiff was experiencing "mild pain . . . on the right first MTPJ." Id. Yet Plaintiff informed Dr. Hiatt that he felt that "the pain in the right foot is significantly better" than it had been previously. Id.

### v. Dr. Glasser's Evaluation

Dr. Jay Glasser, DPM, is also certified as a Qualified Medical Examiner ("QME"). AR 348. Plaintiff was evaluated by Dr. Glasser on September 29, 2006 in relation to a worker's compensation claim. AR 342. Plaintiff presented with discomfort in both feet. AR 343. Upon conducting his examination, Dr. Glasser noted Plaintiff's complaints of foot discomfort and opined that "the nature of [his foot] complaints fit the profile of a patient with back radiculopathy." AR 346. He further stated that "[i]t is my opinion that the patient may be experiencing nerve pains originating from the lower back." Id. Dr. Glasser reported that in regards to his disability status, Plaintiff remained "temporarily partially disabled" at the time of the exam. AR 347. In addition, he expressed that modified work restrictions should include "[s]edentary work only." Id.

On October 29, 2007, Dr. Glasser again examined Plaintiff and provided a supplemental report at the request of the attorneys involved in this case. AR 327. Dr. Glasser noted that "[t]he primary responsibility in this report is to provide a rating of disability and then to apportion the disability as indicated." Id. After the exam, Dr. Glasser concluded that "[o]n the open labor market this patient needs a modified work restriction which contemplates a semi sedentary job. He can be up and down throughout the day for brief periods. He should not lift, push, pull or carry more than 5-10 pounds on a regular basis." AR 332. In sum, he assessed an 11% whole person impairment. AR 333.

### vi.   Dr. Burt's Evaluation

On April 24, 2007, orthopedist and QME Dr. Andrew Burt evaluated Plaintiff in relation to his application for social security disability benefits. AR 313. Based on his one-time examination of Plaintiff, Dr. Burt diagnosed the following medical conditions: chronic descogenic back pain with sciatica; degenerative lumbar facet authority, bilateral; post-operative status surgical debridement, right foot metatarsophalangeal joint with sesamoid resection; and post-traumatic metatarsophalangeal joint arthropathy, both feet, with chronic synovitis of the metatarsophalangeal joint. AR 319. Dr. Burt found that Plaintiff had reached maximum medical improvement at that time. AR 320.

Dr. Burt then went on assess Plaintiff's residual functional capacity in regard to both his back and foot injuries. Id. In regard to his back injury, Dr. Burt opined that:

> Disability residual at the lumbar spine restricts to a preclusion from heavy lifting, repetitive bending, and stopping. This contemplates loss of about 50% of pre-injury capacity for lifting, bending, and stooping. An additional preclusion for the back would allow him to avoid prolonged positioning, either sitting or standing. He needs to be able to change position to relieve his pain.

Id. Regarding Plaintiff's feet injuries, Dr. Burt determined that "disability residual at both feet qualifies for sedentary restrictions. This contemplates that the individual could work in a seated position primarily at a bench or table with some degree of standing and walking permitted." Id.

Dr Burt also stated that Plaintiff "takes muscle relaxants and narcotics which tend to interfere with his ability to concentrate and cognate and he has to lie down frequently to relieve the symptoms across his back and lower extremities." AR 321. The doctor concludes his report with the assertion that "[t]he combination of factors has rendered Mr. Higgins unemployable and a non-candidate for vocational rehabilitation. He cannot participate in gameful [sic] employment or compete in the labor market at a less than sedentary level. He has to lie down and elevate his feet frequently during the day." Id.

### vii.   Dr. Dipsia's Evaluation

On May 12, 2008, Dr. Antoine Dipsia completed a "Physical Residual Functional Capacity Assessment" of Plaintiff. AR 403. Dr. Dipsia's evaluation was based on the record rather than firsthand evaluations of Plaintiff. Based on his review, Dr. Dipsia found that Plaintiff could stand and/or walk (with normal breaks) for a total of at least two hours in an eight hour workday. AR 404. He noted that Plaintiff could sit (with normal breaks) for a total of approximately six hours in an eight-hour workday. Id. He observed that Plaintiff's capacity for activities such as climbing, kneeling, crouching, or crawling is limited to "occasionally" or "never." AR 405. Dr. Dipsia's evaluation ultimately concludes that Plaintiff's residual functional capacity is "sedentary." Lastly, regarding inconsistencies within or between Plaintiff's allegations and the available medical reports, Dr. Dispsia noted that Plaintiff is partially credible, but did not consider his testimony to be wholly credible when compared with the objective evidence. AR 409.

### viii.   Evaluation from Sutter Lakeside Hospital

On October 12, 2009, the Family Medicine Specialty Clinic of Sutter Lakeside Hospital issued an assessment of Plaintiff's condition pursuant to a follow-up visit Plaintiff made to the office. AR 460-461. The report states, in pertinent part:

> [Plaintiff] has been coming to us for several months trying to get social security disability. He says he has a lawyer friend who can help him procure these benefits. To the best of our ability through examination and the MRI findings we have read he has minimal degenerative disk disease with some mild bulging in his lumbar spine, which does not really constitute the criterion necessary for permanent disability. . . . . He states that he cannot sit for long periods of time

> or stand for long periods of time, but nothing in his clinical examination was suggested [sic] he has any long tract signs or radiculopathy . . . . We do not have any major objective data at this point that can document a severity of pain that he is complaining of that would necessitate any further intervention.

AR 460. The report closes with the Hospital's finding that Plaintiff should be able to remain in the job market if he "finds an occupation which is more sedentary and more conducive to his underlying condition." AR 460-461.

## STANDARD OF REVIEW

This Court's jurisdiction is limited to determining whether the Social Security Administration's denial of benefits is supported by substantial evidence in the administrative record. See 42 U.S.C. § 405(g). A district court may overturn a decision to deny benefits only if it is not supported by substantial evidence or if the decision is based on legal error. See Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); Magallenes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989). The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are to be resolved by the ALJ. See id.; Magallenes, 881 F.2d at 750. The decision of the ALJ will be upheld if the evidence is "susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1040.

## DISCUSSION

A claimant is entitled to disability insurance benefits if he can demonstrate that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that can be expected to result in death or last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1). The ALJ conducts a five-step sequential inquiry to determine whether a claimant is entitled to benefits. 20 C.F.R. § 416.920. At the first step, the ALJ considers whether the claimant is currently engaged in substantial gainful activity (i.e., if the plaintiff is currently working); if the claimant is not engaged in substantial gainful activity, the second step asks if the claimant has a severe impairment or

1    combination of impairments (i.e., an impairment that has a significant effect on the
2    claimant's ability to function); if the claimant has a severe impairment, the third step asks if
3    the claimant has a condition which meets or equals the conditions outlined in the Listings of
4    Impairments in Appendix 1 of the Regulations (the "Listings"); if the claimant does not have
5    such a condition, the fourth step assesses the claimant's residual functional capacity and
6    determines whether the claimant is still capable of performing past relevant work; if the
7    claimant is not capable of performing his past relevant work, the fifth and final step asks
8    whether the claimant can perform any other work based on the claimant's residual functional
9    capacity, age, education, and work experience. Id. §§ 404.1520(b)-404.1520(f)(1).

10   Here, the ALJ found at step five that Plaintiff's residual functional capacity rendered
11   him "capable of making a successful adjustment to other work that exists in significant
12   numbers in the national economy." AR 18. Plaintiff challenges the ALJ's opinion as
13   follows: 1) "whether Defendant applied improper legal standards in discounting an opinion
14   from a specialist examining physician;" 2) "whether the findings on residual functional
15   capacity were supported by substantial evidence with proper application of law;" and 3)
16   "whether the ALJ improperly discounted Plaintiff's statements about symptoms and
17   limitations." (Dkt. No. 14 at 5-9.) The Court considers each of these arguments in turn.

### A. The ALJ's Treatment of Dr. Burt's Opinion

Plaintiff's primary challenge to the ALJ's decision centers upon whether the ALJ improperly discounted the medical opinion of Dr. Andrew Burt, who did not treat Plaintiff but examined him on one occasion. "Cases in [the Ninth Circuit] distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those that neither examine nor treat the claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). In evaluating medical opinions, more weight is generally afforded "to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Id. In fact, the opinions of treating physicians are given such weight that "[t]he ALJ must either accept the opinions of [a claimant's] treating physicians or give

specific and legitimate reasons for rejecting them." Embrey v. Bowen, 849 F.2d 418, 422 n.3 (9th Cir. 1988). In cases without opinions by treating physicians, "the opinion of an examining physician is . . . entitled to greater weight than the opinion of a nonexamining physician," and "the Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician." Lester, 81 F.3d at 830 (citing Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990)). Here, however, a number of treating physicians provided opinions for the ALJ's review, and examining physician Dr. Burt's conclusions were not uncontradicted.

Plaintiff's principal argument is that the ALJ "seem[s] to have rejected without explanation, or ignored" key portions of examining physician Dr. Burt's opinion; namely his determination that Plaintiff (1) should avoid prolonged positioning due to the injury to his lower back; and (2) qualifies for disability under the listings based on various factors. AR 320; (Dkt. No. 14 at 6.) However, the Court finds that the ALJ's treatment of Dr. Burt's opinion was proper for two reasons. First, a number of Dr. Burt's conclusions were contradicted by Plaintiff's treating physicians. Second, the ALJ did not discount Dr. Burt's report in its entirety; rather, he functionally adopted Dr. Burt's findings in part and rejected them in part.

The portion of Dr. Burt's opinion ultimately discounted by the ALJ was expressly contradicted by other findings in the record. Dr. Burt's assertion that Plaintiff "qualifies for social security disability under the listings" is unsupported by the opinions of treating physician Dr. Chan, the treating doctors at Sutter Lakeside Hospital, and examining physician Dr. Glasser. Therefore, Dr. Burt's report is *not* an "uncontradicted opinion" that would require the ALJ to provide "clear and convincing reasons" for declining to adopt it in its entirety. Yet even if Dr. Burt's opinion was not partially contradicted by other findings in the record, the ALJ nonetheless provided clear and convincing reasons for his ultimate conclusion when he stated that "Dr. Burt . . . opined that the claimant's medical disorders were of listing level severity. I have discounted such opinion based on my evaluation above." AR 16. The evaluation to which the ALJ referred was quite specific. For instance,

11

the ALJ stated that Plaintiff "pursued acute and aggressive medical care through Dr. Hiatt with good results . . . . Dr. Glasser also believed that the symptoms in the right foot had resolved and there has been no further aggressive medical attention to suggest that the claimant is unable to perform sedentary functions." Id. In addition, the ALJ found that "the back disorder has involved only conservative and symptomatic care that does not support a loss of ability for sedentary work." Id.

Although the ALJ rejected Dr. Burt's finding that Plaintiff qualifies for disability benefits based upon his back injury, the ALJ did not reject Dr. Burt's opinion in its entirety. AR 15. For instance, the ALJ specifically noted that "[i]t was Dr. Burt's opinion the claimant was precluded from heavy lifting, repetitive bending and stooping, and prolonged positioning. Dr. Burt further believed that the claimant was limited to sedentary functions due to the disorder in the feet." Id. The ALJ in fact relied on Dr. Burt's findings in issuing his opinion, concluding that "the claimant's exertional capacity is consistent with sedentary work and supported by the opinions of the state agency consulting physician [Dr. Dipsia] and Dr. Burt." Id.

In conclusion, the ALJ provided sufficient justification for rejecting, in part, the opinion of Dr. Burt. Further, Dr. Burt was only an examining physician, and his conclusion was contradicted by information contained in the reports of at least two treating physicians, whose opinions carry greater weight. The Court therefore concludes that the ALJ acted within his lawful discretion in electing to discount a portion of Dr. Burt's opinion in reaching the conclusion that Plaintiff can perform sedentary work in spite of his injuries.

**B.      The AlJ's Findings Regarding Plaintiff's Residual Functional Capacity**

In determining Residual Functional Capacity ("RFC"), "the ALJ must consider whether the aggregate of [Plaintiff's] mental and physical impairments may so incapacitate him that he is unable to perform available work." Light v. Soc. Sec. Admin., 119 F.3d 789, 793 (9th Cir. 1997). An ALJ's determination of a claimant's RFC will be affirmed if the ALJ applied the proper legal standard and his decision is supported by substantial evidence. See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005). Plaintiff stresses that the

ALJ's finding regarding his RFC was "not supported by substantial evidence and should not be affirmed." (Dkt. No. 14 at 7.)

Plaintiff argues that Dr. Dipsia's opinion represents "weak support" for the RFC ultimately found as "[a]n opinion from a non-examining physician, like Dr. Dipsia, is not substantial evidence to outweigh contradictory opinion from any examining physician [such as Dr. Burt]." (Dkt. No. 14 at 7.) It is well-established, however, that the opinion of a physician who did not examine the claimant can constitute substantial evidence if "it is consistent with other independent evidence in the record." Lester, 81 F.3d at 830-31; see also Thomas, 278 F.3d at 957 (noting that "the opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record"); Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (stating that "opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it").

In the present case, Dr. Dipsia's determination that Plaintiff had the RFC to perform sedentary work in spite of his injuries is supported by the medical opinions of other physicians who treated Plaintiff in the period following his injury. For instance, Plaintiff's longtime physician Dr. Jackie Chan opined that "[Plaintiff] is likely a qualified injured worker. Permanent prophylactic work restrictions should include no lifting greater than 20 pounds, no pulling or pushing greater than 50 pounds, and no repetitive bending or stooping at the waist." AR 358.

Further, the physicians from Sutter Lakeside Hospital reported that Plaintiff's injuries "do[] not really constitute the criterion necessary for permanent disability . . . . [Plaintiff] states that he cannot sit for long periods of time or stand for long periods of time, but nothing in his clinical examination was suggested [sic] he has any long tract signs or radiculopathy." AR 460. Dr. Glasser's evaluation provides further support for Dr. Dipsia's options. After physically examining Plaintiff, Dr. Glasser reported that "this patient needs a modified work

1 restriction which contemplates a semi sedentary job. He can be up and down throughout the
2 day for brief periods." AR 332.

3 Therefore, the ALJ did not improperly rely upon Dr. Dipsia's conclusions to bolster
4 his finding regarding Plaintiff's RFC. Dr. Dipsia's findings are supported by other medical
5 opinions in the record and thus constitute "substantial evidence." See Lester, 81 F.3d at 830-
6 31. Substantial evidence therefore exists in the record to support the ALJ's determination
7 that Plaintiff's RFC indicates that he can engage in work at a sedentary level.

### C. The ALJ's Consideration of Plaintiff's Credibility

Credibility determinations are within the province of the ALJ. "If the ALJ's credibility finding is supported by substantial evidence in the record, [a reviewing court] may not engage in second-guessing." Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002). However, the ALJ must make specific findings to support a conclusion that a particular claimant's allegations of severity are not credible. SSR 96-7p, 1996 WL 374186 (July 2, 1996) (stating that a credibility finding "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight"); see also Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (asserting that a court must "determine whether the ALJ provided clear and convincing reasons for [making an] adverse credibility finding."). An ALJ's credibility finding must be properly supported by the record and sufficiently specific to ensure a reviewing court that the ALJ did not "arbitrarily discredit" a claimant's personal testimony. Thomas, 278 F.3d at 958.

Defendant correctly notes that " the ALJ did not find Plaintiff's testimony wholly unbelievable, but that he was not entirely credible regarding the extent and severity of his symptoms." (Dkt. No. 15 at 7.) In his report the ALJ stated that "[t]here are medical disorders to account for [Plaintiff's] subjective complaints but I find that the alleged severity and limitations are not entirely credible . . . . The medical findings, medical opinions, and treatment history . . . do not substantiate the level of pain and limitations claimed." AR 16. The ALJ supported his credibility finding with specific reference to the medical records. Id.

14

Both Dr. Hiatt and Dr. Glasser found that Plaintiff's right foot pain had improved and that he was not experiencing significant residual effects. Id. The ALJ also noted that Plaintiff has received no further treatment, apart from conservative care, to suggest that he continues to be seriously symptomatic in his feet or back. Id. In conclusion, the ALJ stated that "while I relied on the claimant's testimony to the extent that it is supported by the medical evidence, I do not find that the alleged intensity, persistence, and functionally limiting effects of the subjective complaints are credible." Id.

The ALJ's decision to regard Plaintiff as only partially credible is further supported by statements made by Plaintiff himself at his hearing before the ALJ. Specifically, when Plaintiff was asked by his attorney why he could not do a simple job that allowed him to sit rather than stand, even Plaintiff admitted, "I don't know that I can't sit. If I had concessions from an employer." AR 33. This statement is consistent with the majority of medical findings in this case; however, Plaintiff gave different information to Dr. Burt regarding the residual effects of his injuries—for instance that "[h]e has to lie down and elevate his feet frequently during the day." AR 321.

The aforementioned statements constitute "specific findings" supporting the ALJ's decision to treat Plaintiff's testimony as only partially credible. Thus, the Court concludes that the ALJ's findings regarding Plaintiff's credibility are clearly explained and supported by the record in this case.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment (Dkt. No. 14) is DENIED, and Defendant's cross-motion for summary judgment (Dkt. No. 15) is GRANTED.

**IT IS SO ORDERED.**

Dated: March 29, 2012

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE